UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| A.J., by his parents and natural guardians, C.L.J. and C.J., and C.L.J. and C.J., individually, | **MEMORANDUM AND ORDER** 07-CV-2103 (DRH) (MLO) |

                    Plaintiffs,

    -v.-

BOARD OF EDUCATION, EAST ISLIP
UNION FREE SCHOOL DISTRICT,

                  Defendants.
_____

**APPEARANCES:**

**For the Plaintiffs:**
**Deborah Rebore**
500 Bi-County Boulevard, Suite 214 N.
Farmingdale, NY 11735
By: Deborah Rebore, Esq.

**For the Defendants:**
**Guercio & Guercio**
77 Conklin Street
Farmingdale, NY 11735
By: Kelly A. Reape, Esq.

**HURLEY, Senior District Judge:**

            Plaintiffs C.L.J. and C.J. (collectively, "Plaintiffs") bring this action on behalf of

their son, A.J., pursuant to the Individual with Disabilities Education Act (the "IDEA"), 20

U.S.C. § 1400 et seq., seeking review of a denial of educational benefits. The defendant Board of

Education, East Islip Union Free School District (the "District") determined that A.J. did not

qualify for benefits under the IDEA and, on administrative review, an Impartial Hearing Officer

("IHO") and a State Review Officer ("SRO") agreed. The District moves for an Order pursuant

to 20 U.S.C. § 1415(i)(2)(c)(iii) dismissing Plaintiffs' Complaint. For the reasons that follow,

the District's motion is granted and the Complaint is dismissed.

***BACKGROUND***

The material facts, drawn from the Complaint, the parties' Local 56.1

Statements,[1] and the record below, are undisputed unless otherwise noted.

**I.     *A.J's Request for Disability Classification is Denied by the District***

A.J. is presently an elementary school student in the District.  During the 2004-

2005 school year, A.J. attended his first year of preschool in the District.  Having noted

significant delays in A.J.'s fine motor and social emotional functioning, the District's Committee

of Preschool Special Education ("CPSE") determined that A.J. met the criteria for classification

as a preschool student with a disability.  A.J. received occupational therapy two times per week

at a sensory integrated gym, and special education services in his classroom.

In May 2005, the District's CPSE determined that A.J. would not be eligible to

receive preschool special education services for the 2005-2006 school year due to teacher reports

of steady progress and because he had reached kindergarten age.  Nonetheless, Plaintiffs decided

to keep A.J. in preschool for the 2005-2006 school year at their own expense.  A.J. attended the

same preschool he had attended during the previous year with the same teachers, but he attended

as a regular education student and not as a preschool student with a disability.

According to A.J.'s mother, A.J. began to "fall apart" as a regular education

student during the 2005-2006 school year.  On January 20, 2006, A.J.'s mother attended a

---

[1] Although the parties "did not frame their respective arguments as motions for summary
judgment, IDEA actions in federal court generally are resolved by examination of the
administrative record in a summary judgment procedural posture." *N.C. ex rel. M.C. v. Bedford
Cent. Sch. Dist.*, 473 F. Supp. 2d 532, 541 (S.D.N.Y. 2007), *aff'd*, 300 F. App'x. 11 (2d Cir.
2008) (unpublished opinion).

parent-teacher conference where A.J.'s teachers reportedly indicated that A.J. was "fine" academically, but that his behavior was disruptive, compulsive and all-consuming. In February 2006, Plaintiffs referred A.J. to the District's Committee on Special Education ("CSE") for an evaluation, citing concerns regarding his socialization behaviors. Thereafter, a school psychologist completed a parent-initiated CSE referral for A.J. Based upon the psychologist's conversation with Enid Herbert ("Herbert"), A.J.'s classroom teacher, the psychologist wrote on the referral form that A.J. "does well academically [but] has difficulty socializing with peers." (Dist. Ex. 28.)

In May 2006, the District's CSE met to determine A.J.'s eligibility for special education and determined that A.J. was ineligible for such services because he did not evidence a disability, noting that "[t]he classroom teacher reports that [A.J.] is making steady progress." (Dist. Ex. 3.) The CSE reconvened in June 2006 to consider some additional evidence proffered by Plaintiffs and again determined that A.J. did "not evidence a handicapping condition." (Dist. Ex. 4.) The CSE indicated that it would meet on or before October 19, 2006 to review A.J.'s progress in kindergarten. (Dist. Ex. 3.)

In reaching its decisions, the CSE reviewed several reports submitted by Plaintiffs, including: (1) three medical evaluations diagnosing A.J. with Asperger's Disorder on the Autism spectrum ("Asperger's") and Attention Deficit Hyperactivity Disorder ("ADHD"); (2) an April 2006 report from A.J.'s private behavioral doctor indicating that A.J. "will require services when he enters school in September 2006, most significantly services that support development of pragmatic social skills" (Dist. Ex. 14); and (3) a May 2006 progress report from A.J.'s private occupational therapist indicating that A.J. had "serious social issues that need

consistent intervention." (Dist. Ex 11.) The CSE also reviewed several evaluations of A.J. conducted by District personnel, including: (1) a March 2006 classroom observation report by Rose Mary Curtin ("Curtin"), a special education teacher, which notes that A.J. "exhibited inappropriate behaviors and required frequent redirection. His interactions with his peers were often inappropriate" (Dist. Ex. 8); (2) a March 2006 speech evaluation report finding that A.J. "exhibited above average skills in overall language development" (Dist. Ex. 5); (3) a March 2006 school psychologist report indicating that A.J. functioned within the average range and had average verbal and nonverbal abilities (Dist. Ex. 6); and (4) a March 2006 education evaluation finding that A.J. "does well academically but has difficulty socializing with his peers. (Dist. Ex. 7.)

## II. *Plaintiffs' Request for an Impartial Hearing and the IHO Decision*

On July 26, 2006, Plaintiffs filed a request for an impartial hearing, arguing that their private evaluations supported a classification of Autism based on Asperger's and also supported their son's need for special education services. Plaintiffs disputed the findings reached by the May 2006 and June 2006 CSEs and requested reimbursement for privately obtained occupational therapy and counseling.

An impartial hearing convened on September 28, 2006, and after eight days of testimony concluded on October 25, 2006. A.J.'s mother testified that her son's behavior deteriorated during the 2005-2006 school year, and that the 2006-2007 school year proved thus far to be much of the same. She testified that A.J. started hitting others, using inappropriate language, and required frequent redirection.

A.J.'s kindergarten teacher for the 2006-2007 school year testified that A.J. had

excellent work habits and was happy to be in the classroom. She also testified that A.J. had exhibited some inappropriate behaviors such as touching another child, saying unkind words, and throwing things. However, she stated that these behaviors are not unique to A.J. and that she could adequately deal with these behaviors in class.

Curtin, a special education teacher who had performed a March 2006 classroom observation, also testified. She stated that A.J.'s behavior did not negatively affect the other students and that while there was room for improvement, it was nothing the classroom teacher could not handle.

Dr. Monica Deschryver, a recently retired psychologist, testified that she observed A.J. in the classroom and that he demonstrated impulsive and hyperactive behavior, yet at no point did the teacher lose control over the classroom.[2]

By decision dated November 16, 2006, the IHO denied Plaintiffs' request for relief, finding that Plaintiffs failed to meet their burden of establishing that the District erred in determining that A.J. should not be classified as a child with Autism. Although the evaluations submitted by Plaintiffs supported a diagnosis of Asperger's on the Autism spectrum, the IHO nonetheless found that A.J. was not eligible for special educations services, explaining:

> Assuming *arguendo* that the reported behaviors are an established fact, we have to look at the criteria for autism under the Commissioner's regulations:
>
> > 1) the student must display characteristic symptoms of the condition and
> > 2) It must be established that the condition adversely affects a student's educational

---

[2] For a more complete synopsis of the evidence presented at the hearing before the IHO, *see* IHO's November 16, 2006 decision, annexed to the Complaint as Exhibit A.

performance.  (*J.D. v. Pawling School District*, 224 F.3d 60 (2d Cir. 2000)

It is the second prong that the District relies upon and the part the Parent must sustain.  The question before us is whether the described behaviors *severely* impact and impede the child's ability to learn.  Clearly they do not since [A.J.] is progressing well academically.  It is the District's contention that his behavior does not impede his ability to learn, and I concur with that conclusion.  The District evaluators in Exhibits 5, 6, 7, and 8 determined that [A.J.'s] behavior did not rise to the level of severe, or serve as an impediment to his learning. . . .

The child's classroom teacher, who spends a full day in the Kindergarten class with the student, testified that his behavioral symptoms do[] not rise to a level that would qualify him for classification under the regulations and that his academics do not suffer in any respect.  She perhaps occupies the best vantage point from which to make that judgment.  That determination was also corroborated by the Parent rebuttal witness who testified that the child's behavior did not interfere with the learning process and that the teacher was in complete control of the classroom.

. . . .

What we come down to is perhaps a subjective interpretation of the level of 'severity.'" . . . .

The Parent failed to sustain her burden by a preponderance of the evidence that the CSE incorrectly determined that the child was ineligible for Special Education because he does not have a disability that adversely impacts upon his educational performance. . . . .

(Compl. Ex. A at 24 (emphasis in original).)

## III.     *Plaintiffs' Appeal to the New York State Education Department*

Plaintiffs appealed the decision of the IHO to the New York State Education Department.  On February 2, 2007, SRO Paul F. Kelly dismissed the appeal, finding as follows:

[T]he May 2006 and June 2006 CSEs appropriately declined to

> identify the child as eligible for special education and services
> under the IDEA because the record as a whole does not
> demonstrate that his educational performance was adversely
> affected by his diagnoses of Asperger's, DSI, ADHD, or social
> pragmatic difficulties, or that he needs special education services.

(Compl., Ex. B. at 11.)  SRO Kelly rejected Plaintiffs' argument that the IHO applied the wrong

standard when he inquired whether A.J.'s disability "severely impacted" upon A.J.'s educational

performance rather than whether A.J.'s disability "adversely impacted" upon his educational

performance, summarily stating that the IHO "applied a proper legal analysis in reaching his

conclusions."  (*Id.* at 8.)  SRO Kelly also rejected Plaintiffs' argument that the IHO erred by

finding that "educational performance" is only related to academic progress, and found that

notwithstanding Plaintiffs' concerns about their son's socialization skills, because A.J. was

performing well academically, the District was correct in not classifying A.J. as a student with a

disability pursuant to the IDEA.

## IV.    *The Instant Action*

Plaintiffs filed the instant action seeking review of the SRO decision.

Specifically, Plaintiffs request that this Court determine that the District failed to classify A.J. as

a student with a disability in June 2006 and as a result failed to provide special education

services to him for the 2006/2007 school year.  The District moves to dismiss the Complaint

pursuant to 20 U.S.C. § 1415(i)(2)(c)(iii).  For the reasons stated below, the District's motion is

granted and the Complaint is dismissed.

## *DISCUSSION*

## I.    *Standard of Review*

Section 1415(i)(2)(C) of the IDEA, previously known as the Education of the

Handicapped Act, provides that:

> In any action brought under this paragraph, the court--
>
>> (i) shall receive the records of the administrative proceedings;
>>
>> (ii) shall hear additional evidence at the request of a party; and
>>
>> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C). Although IDEA actions in federal court are generally resolved in a summary judgment procedural posture, in an IDEA action, the existence of a disputed issue of material fact will not defeat the motion. *See N.C. ex rel. M.C. v. Bedford Cent. Sch. Dist.*, 473 F. Supp. 2d 532, 541 (S.D.N.Y. 2007), *aff'd*, 300 F. App'x 11 (2d Cir. 2008) (unpublished opinion). Instead, federal courts reviewing administrative determinations under the IDEA must conduct an independent review of the administrative evidence and base their decisions on the preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C). The party seeking relief has the burden of proof when challenging an administrative decision. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005).

Ordinarily, a district court is expected to give "due weight" to the findings of a state administrative proceeding. *See Muller v. Comm. on Special Educ.*, 145 F.3d 95, 101 (2d Cir. 1998). However, no deference is required where, as here, the issue before the Court is "whether the school district properly classified [A.J.] as an individual with or without a disability in the first instance." *Id.* Because "the state administrative officials [a]re in no better position than the district court to make conclusions with respect to [A.J.'s] statutory eligibility based on

the record," this Court is "free to consider the issue of [A.J.'s] statutory eligibility *de novo*." *Id.* Accordingly, the Court will review the record de novo. *See C.B. ex rel. Z.G. v. Dep't of Educ.*, 322 F. App'x 20, 21 (2d Cir. 2009) (unpublished opinion) (stating that deference is not required where "the district court is presented with the threshold question of a child's statutory eligibility for special education services; to wit, whether the child was disabled").

II.   ***Plaintiffs Have not Established by a Preponderance of the Evidence that A.J. Qualifies for Special Education Benefits Under the IDEA***

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also Muller*, 145 F.3d at 102. The IDEA defines "children with disabilities" as children having one of the specifically delineated conditions, including Autism, "who, by reason thereof, need[] special education and related services." 20 U.S.C. § 1401(3)(A); *see also* 34 C.F.R. § 300.8(a)(1). The federal regulations promulgated under the statute further define Autism as "a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that *adversely affects a child's educational performance*." 34 C.F.R. § 300.8(c)(1)(i) (emphasis added). Thus, in determining IDEA eligibility, the Court must examine: (1) whether A.J.'s disability falls within at least one of the delineated classifications; (2) whether the disability has an adverse effect on educational performance; and (3) whether, as a result, A.J. needs "special education and related services." The District contends that Plaintiffs cannot establish the first two elements, which are addressed separately below.

**A.**      *Whether A.J. has one of the Specifically Delineated Conditions*

Whether or not A.J. has Asperger's, which is on the Autism spectrum, is not seriously in dispute.  Although the District suggests that A.J.'s diagnosis of Asperger's is "unsubstantiated" and "highly suspect," (Def.'s Mem. of Law in Supp. at 10), the District failed to raise this issue below.  In fact, both the IHO and the SRO accepted A.J.'s diagnosis as an established fact.  (*See* Compl. Ex A. at 23; *id.* Ex. B at 1, 11.)  Moreover, other than the District's innuendos, the District has presented no evidence suggesting that A.J. does not have Asperger's. Accordingly, the Court finds that Plaintiffs have established by a preponderance of the evidence that A.J. has Autism.

**B.**      *Whether A.J.'s Autism Adversely Affects His Educational Performance*

The next issue, viz. whether A.J.'s Autism "adversely affects [his] educational performance" is not as simple.  Plaintiffs argue that the IHO and the SRO misapplied this standard in two ways.  First, Plaintiffs assert that the IHO and SRO erroneously limited the term "educational performance" to academic performance.  Second, Plaintiffs maintain that the IHO and SRO incorrectly construed "adversely affects" to require a severe effect on performance. The Court will address Plaintiffs' arguments in turn.

**1.**      *Effect on Educational Performance*

"[N]either the IDEA nor the federal regulations define the term[] . . . 'adverse effect on educational performance,' leaving it to each State to give substance to these term[]." *J.D. ex rel. J.D. v. Pawlett Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000).  The New York State regulations pertaining to the education of children with disabilities are found in 8 N.Y.C.R.R. Part 200.  Section 200.1(zz)(1) provides as follows:

> Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, *that adversely affects a student's educational performance*. . . .

8 N.Y.C.R.R. § 200.1(zz)(1) (emphasis added).  Thus, the New York regulations simply mirror the federal regulations and do not further elaborate on this phrase.

The District argues that the term "adversely affects a student's educational performance" means that the child's *academic* performance must be adversely affected by his diagnosis.  Plaintiffs disagree, urging that "educational performance" is more than just academics, and must include reference to the child's physical, emotional, and social needs.  The Court explores the parties' positions in more detail below.

### (a)  *The District's Position*

In arguing that educational performance is limited to academics, the District places great reliance on the Second Circuit's decision in *J.D.*, the same decision cited by the IHO, wherein the court held that an academically gifted student with emotional and behavioral problems was not eligible for special education services under the IDEA because the student had not established that his emotional condition adversely affected his educational performance.  224 F.3d at 68.  However, in reaching this decision, the Second Circuit applied Vermont's regulatory definitions, which specifically define "educational performance" as requiring a student to perform poorly in one or more "basic skills."  *Id.* at 66.  "Basic skills" are defined as oral expression, listening comprehension, written expression, basic reading skills, reading comprehension, mathematics calculation, mathematics reasoning, and motor skills."  *Id.*  The Circuit concluded that the student's "emotional condition, including his difficulty with interpersonal relationships and negative feelings, . . . while . . . signs of an emotional disability,

under the statutory and administrative schemes, . . . are not measures of an adverse effect on basic skills by which educational performance must be assessed." *Id.* at 68. Because the evidence established that the student "consistently performed above the mean in math and other basic skills," *id.* at 67, the court found that the student's "basic skills, and hence his educational performance, were not adversely affected by his disability within the meaning of the Vermont Rule." *Id.* Unlike the Vermont regulations, however, the New York regulations do not define "educational performance." Thus, because *J.D.* relied on Vermont's regulatory definitions which are inapplicable to the case at hand, the decision does not support the District's position.

**(b)** *Plaintiffs' Position*

In arguing that "educational performance" should not be so narrowly construed as to encompass solely academics, Plaintiffs rely on several federal and state regulations which they claim support that view. For example, they cite to the federal and state regulations governing evaluations, which mandate that districts "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information" when conducting evaluations. 20 U.S.C. § 1414(b)(2)(A); *see also* 8 N.Y.C.R.R. § 200.4(b) (same). Plaintiffs also cite to the federal and state regulations governing the services which must be provided once a student is found eligible. For example, 34 C.F.R. § 300.107(a) provides that once a district determines eligibility, the district must provide "nonacademic and extracurricular services and activities in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities." 34 C.F.R. § 300.107(a). Similarly, the state regulations provide that in considering the "individual needs of a student," the district must consider not only academic achievement but also functional performance, learning

characteristics, social development, physical development, and management needs.  8

N.Y.C.R.R. § 200.1(ww)(3)(i).  Thus, Plaintiffs argue that because districts are required to

consider non-academic factors both in evaluating students and later in providing services for

eligible students, they res ipsa are required to consider such factors in determining eligibility.[3]

          Plaintiffs also cite to a district court case in this Circuit, as well as cases outside

of this Circuit, which seemingly support Plaintiffs' contention that "educational performance"

should not be  limited to academic performance.  *See Mr. I. ex rel. L.I. v. Me. Sch. Admin. Dist.

No. 55*, 480 F.3d 1, 11-12 (1st Cir. 2007) (finding that "educational performance in Maine is

more than just academics" as Maine regulation defines "educational performance" to include

both academic and non-academic areas); *Corchado v. Bd. of Educ.*, 86 F. Supp. 2d 168

(W.D.N.Y. 2000) ("The IHO's reasoning, in effect, precludes a child whose academic

achievement can be described as 'satisfactory' from being able to demonstrate that documented

disabilities adversely affected the student's academic performance.  This should not and cannot

be the litmus test for eligibility under the IDEA."); *Mary P. v. Il. State Bd. of Educ.*, 919 F. Supp.

1173 (N.D. Ill. 1996) ("Educational performance" means more than a child's ability to meet

academic criteria.  It must also include reference to the child's development of communication

skills, social skills, and personality, as the Code, itself, requires.) (citing 34 C.F.R. §

300.533(a)(1), now codified at 34 C.F.R. § 300.306),[4] *amended on other grounds*, 934 F. Supp.

---

[3]  Plaintiffs also point to 8 N.Y.C.R.R. § 200.4(c)(5), which provide that "[a] free
appropriate public education must be available to any student with a disability who needs special
education and related services, even though the student is advancing from grade to grade."  8
N.Y.C.R.R. § 200.4(c)(5).

[4]  34 C.F.R. § 300.306(c) provides that in determining eligibility and educational need,
the districts shall "[d]raw upon information from a variety of sources, including aptitude and

989 (N.D. Ill. 1996)).  None of these cases is binding on the Court.

**(c)**      ***Plaintiffs have not met Their Burden of Establishing
that A.J.'s Educational Performance was Adversely Affected***

The Court recognizes that the proper interpretation of the phrase "educational performance" is a difficult issue, borne out by the multitude of scholarly articles that have been written on the subject.[5]  Nonetheless, for the reasons discussed *infra*, including recently received guidance by the Second Circuit, the Court is constrained to conclude that Plaintiffs have not met their burden of establishing that A.J.'s condition "adversely affects [his] educational performance."  34 C.F.R. § 300.8(c)(1)(I).

After the parties' briefs were submitted, the Second Circuit issued two decisions relevant to the issue at hand.  In *N.C. ex rel. M.C. v. Bedford Cent. Sch. Dist.*, 300 F. App'x 11 (2d Cir. 2008 ) (unpublished opinion), parents challenged the SRO's determination that their child was not a "child with a disability" under the IDEA because he did not have a "severe emotional disturbance" under 8 N.Y.C.R.R. § 2001(zz)(4).  To be classified as emotionally disturbed under this section, a child must display one or more of five designated characteristics "over a long period of time and to a marked degree that adversely affects a student's educational performance."  *Id.*  After finding that the evidence was insufficient to demonstrate the presence of the two characteristics the parents claimed applied, the Circuit found:

---

achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior."  34 C.F.R. § 300.306(c)(1)(i).

    [5] *See, e.g.*, Mark C. Weber, *The IDEA Eligibility Mess*, 57 Buff. L. Rev. 83 (2009); Laura Ketterman, Comment, *Does the Individuals With Disabilities Education Act Exclude Gifted and Talented Children With Emotional Disabilities?  An Analysis of J.D. v. Pawlett*, 32 St. Mary's L.J. 913 (2001)

Even if M.C. did satisfy one or more of the five emotional disturbance characteristics, he still would not qualify as emotionally disturbed because there is insufficient evidence that M.C.'s educational performance was adversely affected by any such condition. *See* N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(zz)(4); *see also* 34 C.F.R. § 300.8(c)(4). M.C. did not fail any of his classes at Fox Lane High School . . ., the public school he attended in the Bedford Central School District. . . . *Cf. Muller ex rel. Muller v. Comm. on Special Educ.*, 145 F.3d 95, 103 (2d Cir. 1998) (addressing child who "failed multiple subjects in the seventh and eighth grades"); *New Paltz Cent. Sch. Dist. v. St. Pierre ex rel. M. S.*, 307 F. Supp. 2d 394, 399 (N.D.N.Y. 2004) (discussing student who "received three failing grades in the 9th grade"). From ninth grade to tenth grade, M.C.'s grade-point average ("GPA") declined only nine points. *Cf. New Paltz*, 307 F. Supp. 2d at 399 n. 11 (observing a GPA decline of 18.26 points). And we cannot conclude on the basis of the record here that this decline was attributable to an emotional disturbance as opposed to M.C.'s acknowledged drug use.

300 F. App'x at 13.

In *C.B. ex rel. Z.G. v. Dep't of Educ.*, 322 F. App'x 20, 21 (2d Cir. 2009) (unpublished opinion), the IHO found that the student was a "child with a disability" under the IDEA based on her ADHD and co-morbid bipolar disorder. The SRO reversed this finding and the district court affirmed, finding that the child was not "other health impair[ed]," which is defined as having a designated condition (including ADHD) "which adversely affects a student's educational performance." 8 N.Y.C.R.R. § 200.1(zz)(10). In rejecting the child's appeal, the Circuit found:

Neither party contests that ADHD and bipolar disorder could qualify as disabling conditions. The question is whether Z.G.'s experience of those conditions adversely impacted her educational performance. Z.G.'s grades and test results demonstrate that she continuously performed well both in public school before she was diagnosed, and at the Dalton school thereafter. The DOE's psychoeducational assessment and a psychological evaluation requested by plaintiff concur in finding that Z.G. tested above

> grade-level and do not opine that Z.G.'s educational performance
> has suffered.  While Z.G's treating psychiatrist and teacher at
> Dalton testified to their observations of Z.G.'s difficulties with
> bipolar disorder and ADHD, there was a continuity of Z.G.'s
> successful performance both before and after her conditions were
> diagnosed.  The evidence on record is insufficient to show that
> Z.G. has suffered an adverse impact on her educational
> performance.

322 F. App'x at 21-22.

The import of these cases is that a child's "difficulties with [his or her] disorder," *id.* at 22, which presumably include emotional and behavioral troubles, are not the proper measure of "educational performance."  Rather, "educational performance" must be assessed by reference to academic performance which appears to be the principal, if not only, guiding factor. *See N.C. ex rel. M.C.*, 300 F. App'x at 13 (finding that even if student displayed characteristics of an emotionally disturbed child, his educational performance was not adversely affected where he did not fail any classes at school and his grade point average dropped only nine points); *C.B. ex rel. Z.G.*, 322 F. App'x at 22 (finding that despite students "difficulties with bipolar disorder and ADHD," his educational performance was not adversely affected where child performed well academically).

Moreover, to the extent it may be implied from Plaintiffs' arguments that A.J.'s "educational performance" has been hampered by his emotional and behavioral problems such that he is unable to reach his maximum academic potential, this idea, albeit in a different context, has been rejected by the Supreme Court.

In *Board of Education v. Rowley*, the Supreme Court was faced with the issue of "[w]hat is meant by the [IDEA's] requirement of a 'free appropriate public education.'"  458

U.S. 176, 186 (1982).[6] The trial court had determined that an eight-year old deaf student, who had been found eligible for services under the IDEA, had not been provided with a free appropriate public education when she was denied a qualified sign language interpreter in her academic classes. *Id.* at 184-86. It found that the student "performs better than the average child in her class and is advancing easily from grade to grade," but "that she understands considerably less of what goes on in class than she could if she were not deaf" and she was "not learning as much, or performing as well academically, as she would without her handicap." *Id.* at 185. The disparity between the student's potential and her actual achievement led the trial court to conclude that she had not been provided with a "free appropriate public education." *Id.* at 185-86. On appeal, the Second Circuit affirmed the trial court's decision. *Id.* at 186.

The Supreme Court reversed. The Court reasoned that the IDEA had been adopted to provide a "basic floor of opportunity," *id.* at 201, and noted that "the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192. The Court rejected the trial's court's analysis that compared the student's performance with her potential, finding instead that "the requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children." *Id.* at 198 (internal quotation marks and citation omitted). "Desirable though that goal might be," the Court found that it was "not the standard that Congress imposed upon States

---

[6] As discussed *supra*, the IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education . . . ." 20 U.S.C. § 1400(d)(1)(A).

which receive funding under the Act." *Id.* at 200.

Although the Court noted that it was not holding that "every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education,'" *id.* at 203 n.24, it did stress that "the *grading and advancement system . . . constitutes an important factor in determining educational benefit.* Children who graduate from our public school systems are considered by our society to have been 'educated' at least to the grade level they have completed, and access to an 'education for handicapped children is precisely what Congress sought to provide in the Act." *Id.* at 203 (emphasis added).

While the Court recognizes that the issues in *Rowley* and the present case are different in that *Rowley* dealt with the standard for services post-eligibility and the instant case concerns the appropriate standard for determining eligibility, the *Rowley* Court's findings regarding the intent of the IDEA are relevant for present purposes. Here, Plaintiffs ask this Court to find that A.J.'s "educational performance" was affected by his Asperger's because despite his academic progress, A.J.'s disorder caused him to be impulsive, to require frequent redirection, and to exhibit inappropriate social behaviors and peer interactions. While it may be that A.J.'s emotional problems are hindering his learning progress, Plaintiffs have not presented any evidence that supports that conclusion. Absent any concrete gauge demonstrating that A.J.'s academic performance has suffered, all the Court is left with is the implication that A.J. is not reaching his full potential, a standard that finds no support in the statute. *See Rowley*, 458 U.S. at 189-90 ("The language of the [IDEA] contains no requirement . . . that States maximize the potential of handicapped children 'commensurate with the opportunity provided to other

children.'"); *see also W.S. ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 150 (S.D.N.Y. 2006) ("It is the ability to make educational progress-not simply the fact of inappropriate behavior-that is the concern of the IDEA."). Thus, as in *N.C. ex rel. M.C.* and *C.B. ex rel. Z.G.*, the two Second Circuit cases cited above, because the record supports the IHO's and SRO's conclusions that A.J. performed well in school despite his disorder, the Court finds that Plaintiffs have failed to demonstrate, by a preponderance of the evidence, that A.J.'s educational performance was adversely affected by his Asperger's.

### 2.     *Adverse Effect*

As discussed *supra*, in order to qualify as a "child with a disability" under the IDEA, Plaintiffs must demonstrate by a preponderance of the evidence that A.J.'s Asperger's "adversely affect[ed his] educational performance." 34 C.F.R. § 300.8(c)(1)(i). Plaintiffs argue that the IHO and SRO misconstrued the "adversely affects" component of the test by requiring Plaintiffs to show that A.J.'s condition had a "severe[]" adverse effect on his educational performance.

The term "adversely affects" is not defined by the federal or state regulations. Relying again on the Second Circuit's decision in *J.D.*, the District maintains that "[t]he Second Circuit has held that 'adverse effect' requires a significant impact on a child's educational performance." (Def.'s Mem. of Law in Supp. at 16.) As noted above, however, in construing the standard, the Second Circuit applied Vermont's regulatory definition, which specifically defines adverse effect as follows: "To establish that a disability has an adverse effect on the student's educational performance, the Basic Staffing Team shall determine and document that the student is functioning *significantly* below expected age or grade norms, in one or more of the

basic skills." *J.D.*, 224 F.3d at 66 (quoting the applicable Vermont regulation) (emphasis

added).  Because the Circuit was construing highly specific definitions as set forth by Vermont

law, which are completely inapplicable to the present case, the District's reliance on *J.D.* is

misplaced.

Absent a statutory directive to the contrary, the Court agrees with Plaintiffs that

the term "adversely affects" should be given its ordinary meaning and that no qualifier such as

"severe" or "significant" should be inferred.  *See Mr. I.*, 480 F.3d at 13 (declining "to infer such

a limitation from Maine's regulatory silence") (internal quotation marks and citation omitted).

Nonetheless, even when the correct legal standard is applied, the result is the same.  The record

reveals that despite A.J.'s Asperger's, A.J. was performing at average to above average levels in

the classroom and was progressing academically.  Therefore, even applying the term's ordinary

meaning, the Court finds by a preponderance of the evidence that A.J.'s condition was not

affecting his educational performance in an adverse or unfavorable way.  *See Muller*, 145 F.3d at

101 (court applies de novo review).

**D.**     *Plaintiffs' § 1983 Claim is Dismissed*

The Complaint asserts a single claim for relief under both the IDEA and 42

U.S.C. § 1983.  (Compl. at 7.)  Citing *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 803 (3d Cir.

2007), the District asserts that relief under § 1983 is not available to a plaintiff seeking to remedy

an alleged violation of IDEA-created rights.  Plaintiffs do not address this issue.

The Supreme Court has recently clarified that when a statute provides for a

private cause of action, courts should ordinarily infer that Congress intended to preclude an

action under § 1983.  *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005).  A

plaintiff may overcome this "ordinary inference that the remedy provided in the statute is exclusive" by providing "textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id.* at 122. Plaintiffs have failed to make this showing. Moreover, cases post-*Rancho Palos*, including the Third Circuit's decision in *A.W.*, have found that the IDEA precludes an action under § 1983. *See, e.g.*, *A.W.*, 486 F.3d at 802 (holding that the remedial schemes for enforcing the IDEA are comprehensive and preclude a § 1983 action); *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006) ("We hold that where the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983 . . . in an attempt to evade the limited remedial structure of the IDEA"). Accordingly, Plaintiffs' § 1983 claim is dismissed.

### CONCLUSION

For all of the reasons stated above, Defendant's motion to dismiss is **GRANTED**. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
        January 8, 2010


            /s
        Denis R. Hurley
        United States Senior District Judge